AUSAs: Catherine Ghosh, Jerry Fang, Meredith Foster, Sebastian Swett, Jacob Fiddelman

| | |
|---|---|
| UNITED STATES DISTRICT COURT<br>SOUTHERN DISTRICT OF NEW YORK | **24 MAG 318** |
| UNITED STATES OF AMERICA | <u>SEALED COMPLAINT</u> |
| v. | Violations of 18 U.S.C. §§ 371, 1001, 1519, 1951, and 2 |
| ANGELA WILLIAMS, | COUNTY OF OFFENSE: |
| Defendant. | NEW YORK |

SOUTHERN DISTRICT OF NEW YORK, ss.:

JEREMY ROSENMAN, being duly sworn, deposes and says that he is a Special Agent with the United States Attorney's Office, Southern District of New York, and charges as follows:

<u>**COUNT ONE**</u>
**(Conspiracy to Solicit and Receive a Bribe by Agent of
Organization Receiving Federal Funds)**

1.  From at least in or about June 2019 up to and including at least in or about March 2022, in the Southern District of New York and elsewhere, ANGELA WILLIAMS, the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit an offense against the United States, to wit, solicitation and receipt of a bribe by an agent of an organization receiving federal funds, in violation of Title 18, United States Code, Section 666(a)(1)(B).

2.  It was a part and an object of the conspiracy that ANGELA WILLIAMS, the defendant, being an agent of an organization, and of a state, local, and Indian tribal government, and an agency thereof, to wit, the New York City Housing Authority ("NYCHA"), which received, in the calendar years 2019 through 2022, benefits in excess of $10,000 under a federal program involving a grant, contract, subsidy, loan, guarantee, insurance, and other form of federal assistance, would and did corruptly solicit and demand for the benefit of a person, and accepted and agreed to accept, a thing of value from a person, intending to be influenced and rewarded in connection with business, a transaction, and a series of transactions of NYCHA involving a thing of value of $5,000 and more, to wit, WILLIAMS conspired to solicit and accept a total of at least approximately $15,000 in bribes in exchange for arranging for certain contractors to receive contracts from NYCHA worth at least $5,000.

Overt Acts

3.  In furtherance of the conspiracy and to effect the illegal object thereof, ANGELA WILLIAMS, the defendant, committed or caused to be committed the following overt acts, among others, in the Southern District of New York and elsewhere:

    a.  On or about June 12, 2019, when a co-conspirator ("CC-1") asked WILLIAMS if receiving a $1,000 per no-bid contract from NYCHA contractors was acceptable

to her ("1k per cool?"), WILLIAMS agreed by stating, in substance and in part, "No problem babe."

(Title 18, United States Code, Section 371.)

## COUNT TWO
### (Conspiracy to Commit Extortion Under Color of Official Right)

4. From at least in or about June 2019 up to and including at least in or about March 2022, in the Southern District of New York and elsewhere, ANGELA WILLIAMS, the defendant, and others known and unknown, knowingly combined, conspired, confederated, and agreed together and with each other to commit extortion under color of official right, as that term is defined in Title 18, United States Code, Section 1951(b)(2), and would and did obstruct, delay, and affect commerce and the movement of articles and commodities in commerce, as that term is defined in Title 18, United States Code, Section 1951(b)(3), to wit, WILLIAMS conspired to obtain money from NYCHA contractors, under color of official right and with the contractors' consent, that was not due WILLIAMS or her office.

(Title 18, United States Code, Section 1951.)

## COUNT THREE
### (Destruction of Evidence)

5. On or about January 11, 2023, ANGELA WILLIAMS, the defendant, knowingly altered, destroyed, mutilated, concealed, covered up, falsified, and made a false entry in a record, document, and tangible object with the intent to impede, obstruct, and influence the investigation and proper administration of a matter within the jurisdiction of a department and agency of the United States, and in relation to and in contemplation of such a matter, to wit, WILLIAMS caused the contents of her cellphone to be destroyed with the intent to impede and obstruct an investigation by the United States Attorney's Office for the Southern District of New York.

(Title 18, United States Code, Sections 1519 and 2.)

## COUNT FOUR
### (False Statements)

6. On or about January 19, 2023, in the Southern District of New York and elsewhere, ANGELA WILLIAMS, the defendant, in a matter within the jurisdiction of the executive branch of the Government of the United States, knowingly and willfully made a materially false, fictitious, and fraudulent statement and representation, to wit, during an interview with a Special Agent with the United States Attorney's Office for the Southern District of New York, WILLIAMS falsely stated, in sum and substance, that a particular cellphone service provider in New York, New York, had deleted the contents of her cellphone to resolve a technical issue with the cellphone, when in truth and in fact, WILLIAMS had deleted or caused to be deleted the contents of the cellphone after learning that law enforcement agents had gathered electronic evidence from another individual's cellphone that implicated her in criminal conduct.

(Title 18, United States Code, Section 1001(a)(2).)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

## OVERVIEW

7. I am a Special Agent in the United States Attorney's Office for the Southern District of New York (the "USAO"), and I have been personally involved in the investigation of this matter. I have been employed by the USAO since 2016. I and other members of the investigative team, which also includes agents from the United States Department of Housing and Urban Development – Office of the Inspector General ("HUD-OIG"), United States Department of Homeland Security – Homeland Security Investigations ("HSI"), the United States Department of Labor – Office of the Inspector General ("DOL-OIG"), and the New York City Department of Investigation ("NYC DOI") (collectively, the "Investigating Agencies"), have experience with bribery and extortion investigations and techniques associated with such investigations.

8. This affidavit is based in part upon my own observations, my conversations with other law enforcement agents and others, my examination of documents and reports prepared by others, my interviews of witnesses, and my training and experience. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all of the facts that I have learned during the course of the investigation. Where the contents of documents, including emails, and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where specifically indicated otherwise.

9. As set forth in more detail below, there is probable cause to believe that ANGELA WILLIAMS, the defendant, an employee of NYCHA at all relevant times, conspired to solicit and accept bribes from contractors in exchange for awarding no-bid contracts for work performed at NYCHA developments, conspired to extort contractors under color of official right, destroyed evidence with the intent to impede and obstruct a federal criminal investigation, and made false statements to federal agents in the course of that same investigation.

## BACKGROUND REGARDING NYCHA AND NO-BID PROCESS

10. Based on my training and experience, review of records and manuals maintained by NYCHA, discussions with NYCHA employees, and discussions with other agents with the Investigating Agencies, I have learned that:

    a. NYCHA is a New York City public entity that provides housing to low- and moderate-income New York City residents.

    b. NYCHA's operations are funded, in part, by grants from the United States Department of Housing and Urban Development ("HUD"). In each year from at least 2019 through 2022, HUD provided over $1.5 billion in funding to NYCHA, making up a substantial portion of NYCHA's budget.

    c. NYCHA procurements funded at least in part through federal funds must abide by various federal regulations, including that NYCHA must conduct all procurement transactions "in a manner providing full and open competition." As such, goods and services must typically be purchased via a bidding process in which NYCHA receives multiple bids after

outreach to multiple prospective bidders. Sometimes the bidding process is for a single job, and other times it is for a "blanket contract" that requires developments to use a particular contractor for all of a certain type of work in a certain area (up to the value of the contract) – for example, a contractor may be awarded a blanket contract to complete up to $1 million of painting work at developments in the Bronx. Even when a contractor is awarded a blanket contract through a bidding process, however, the contractor must be assigned the specific projects as part of that contract by a NYCHA employee at a particular development – for example, to assign the contractor to paint specific apartments at a development – which allows the contractor to complete work under the contract and be paid by NYCHA.

    d. When the value of a contract is under a certain threshold (sometimes called a "micro purchase," and which contractors often refer to as a "purchase order" or "PO" contract), designated staff at NYCHA developments may hire a contractor of their choosing without soliciting multiple bids in order to quickly procure goods or services. This "no-bid" process is faster than the general NYCHA procurement process, and selection of the contractor requires approval of only the designated staff at the development where the work is to be performed. As is relevant to this Complaint, the threshold for a no-bid contract was $5,000 until approximately June 26, 2019, and was then raised to $10,000.

    e. For no-bid contracts, designated NYCHA staff typically communicate with a contractor to request an estimate for the proposed work. The contractor performs an initial site visit and then submits an itemized proposal to the designated staff. The NYCHA employee submits this proposal electronically to the NYCHA Procurement Department, located at 90 Church Street, New York, New York, and upon approval by the Procurement Department a purchase order is issued. After the Procurement Department issues the purchase order, the contractor then performs the work. After the work is completed, a designated NYCHA development staff member performs a site visit. If the staff member deems the contractor's work satisfactory, the NYCHA staff member approves the contractor's "statement of services" and submits it to NYCHA, which then issues payment directly to the contractor or to the contractor's bank account.

    f. NYCHA employees receive the NYCHA Human Resources Manual (the "Manual"), including periodic updated versions. Versions of the Manual from at least 2016 to the present state that "Employees of NYCHA may ***not***: . . .

- Accept a valuable gift as defined by the NYC Conflicts of Interest Board[1] from anyone that employees know or should know is seeking or receiving anything of value from the City or NYCHA.

- Accept anything from anyone other than NYCHA for doing their NYCHA job, except as may be expressly authorized by NYCHA. . . .

- Fail to report directly and without delay, to the Office of the Inspector General or the New York City Department of Investigation, any and all information concerning conduct that they know or should reasonably know to involve corrupt

---

[1] The NYC Conflicts of Interest Board defines a "valuable gift" as "any gift to a public servant which has a value of $50.00 or more, whether in the form of money, service, loan, travel, entertainment, hospitality, thing or promise, or in any other form."

4

or other criminal activity or conflict of interest by any officer or employee of NYCHA or the City of New York which concerns their office or employment, or by any person dealing with NYCHA or the City of New York, which concerns their dealings with NYCHA or the City of New York. . . .

- Bribe, attempt to bribe, or solicit, give, agree to accept or accept a gratuity, benefit, money or anything of value in connection with their actions or duties as employees or in connection with the actions or duties of any other employee of NYCHA.

- Engage in any dishonest conduct, including but not limited to theft, fraud, [or] deceit, . . . falsifying or inappropriately altering any document, record, file or form of NYCHA or other entity, or knowingly submitting any falsified or inappropriately altered document, record, or form to NYCHA or other entity.

- Coerce or attempt to coerce, by intimidation, threat or harassment, any employee or resident of NYCHA or member of the public to engage in any activity that violates any law, or government regulation or any NYCHA rule or regulation."

## WILLIAMS'S EMPLOYMENT BY NYCHA

11. Based on my review of records provided by NYCHA, I have learned the following, in substance and in part, regarding the NYCHA employment history of ANGELA WILLIAMS, the defendant:

    a. From at least in or about March 2019 through at least in or about February 2023, WILLIAMS was employed as a Housing Manager at Farragut Houses, a NYCHA development located in Brooklyn, New York.[2]

    b. On or about February 23, 2023, WILLIAMS retired from NYCHA employment.

## WILLIAMS'S SCHEME TO OBTAIN PAYMENTS FOR NYCHA CONTRACTS

*Background on WILLIAMS's Co-Conspirator*

12. Based on my review of NYCHA records, I have learned the following, in substance and in part, regarding WILLIAMS's co-conspirator, CC-1:

    a. From at least in or about March 2015 through at least in or about April 2021, CC-1 was employed as a superintendent at Douglass Houses, a NYCHA development located in New York, New York (other than from in or about February 2020 through in or about April 2020, when CC-1 worked in the Department of Prevention and Intervention Strategies).

---

[2] A Housing Manager is above the superintendent in the organizational structure of a NYCHA development and oversees management and maintenance operations at the development.

  b. From at least in or about April 2021 through at least in or about September 2022, CC-1 was employed as a superintendent with the NYCHA Office of Mold Assessment and Remediation.

  c. On or about September 30, 2022, after a disciplinary suspension related to federal charges against CC-1 for soliciting and accepting bribes, CC-1 retired from NYCHA employment.

*The Bribery and Extortion Scheme*

  13. Based on my discussions with other law enforcement officers and review of reports prepared by other law enforcement officers and my review of text messages obtained pursuant to judicially-authorized search warrants, I have learned the following, in substance and in part, regarding the scheme by CC-1 and ANGELA WILLIAMS, the defendant, to obtain money from contractors for NYCHA contracts:

  a. In at least in or about June 2019, CC-1 told WILLIAMS about CC-1's scheme to obtain from contractors $1,000 for each no-bid purchase order contract that CC-1 awarded to the contractors. In a series of June 12, 2019 text messages (which CC-1 later deleted from his phone, but which law enforcement was able to recovered), CC-1 wrote to WILLIAMS: "1k per cool?" WILLIAMS responded, "1k per what?" CC-1 replied, "Po" (*i.e.*, purchase order). WILLIAMS replied, "No problem babe as long as you are being blessed. How many should we have with the task at hand[?]" CC-1 replied, "Not me you only..lol."

  b. Approximately one week later, on or about June 18, 2019, CC-1 told WILLIAMS (in another text message that CC-1 deleted from his phone) to call a certain contractor and "tell him [to] send several proposals. Tell him I told you that he could get a second company to help him out" – *i.e.*, set up a second company in order to circumvent NYCHA restrictions on how much work could be awarded to a single contractor.

  c. On or about February 11, 2020, CC-1 told a certain contractor ("Contractor-1"), in a text message CC-1 deleted from his phone, to "***please take care of my friend in Farragut.*** She will be very disappointed. Give me a proposal from the other company and I'll get you a po tomorrow too so ***you could give her 5k total***. I'll make up the difference cause she is my good friend. I'll also give you 2 developments next month. Deal? Call me in the morning and send over the proposal. ***One from me and one from her total.*** I'm going to give you a job already compl [*sic*] for the other company. Just come sign the book. Let me know please erase this text after you read it." (Emphases added). That is, CC-1 told Contractor-1 to give WILLIAMS $5,000, and in exchange CC-1 promised to award purchase orders to Contractor-1 – including one for work that had already been completed, and all Contractor-1 needed to do was sign "the book" (which appears to refer to a book the contractor used to sign in when arriving at the job site for work).[3]

  d. CC-1 continued to assist contractors with obtaining purchase orders at WILLIAMS's housing development in exchange for bribes to WILLIAMS. On or about February 3, 2022, CC-1 asked WILLIAMS to help a new contractor ("Contractor-2") be approved to obtain contracts from NYCHA, because CC-1 was no longer able to take such steps in his new

---

[3] On or about April 7, 2023, counsel for Contractor-1 conveyed to the Government that Contractor-1 claimed to lack any knowledge about bribery conduct.

position with the Office of Mold Assessment and Remediation, rather than at a housing development: "Babe[,] Could you put a company through for someone?  All you would need to do is sign the documents as the approved and get anyone to sign as the requestor.  Then send it in.  ***You will receive 5 per.  There are 2 of them.***  Let me know.  I attempted but he told me after I did the one last week that I wasn't working in a development anymore so I couldn't put it through.  ***That has been my side hustle..lol 1k per.***"  (Emphasis added).

   e. On or about March 9, 2022, when the first purchase order for Contractor-2 was approved Farragut Houses, CC-1 wrote to Contractor-2, "Good morning Brother[.]  You have your first of many PO's.  Please do a great job but ***do not go nowhere near the cost that was projected.  We will speak in the next day or so so I could explain the rest of how it works for her***. Have a blessed day" (emphasis added).  CC-1 then told Contractor-2 to get a particular encrypted messaging application.

   f. On or about February 17, 2023, Contractor-2, accompanied by counsel, was interviewed by law enforcement.  Contractor-2 stated, in substance and in part, that CC-1 had asked Contractor-2 to complete certain contracting work at Farragut Houses, and CC-1 and WILLIAMS both assisted Contractor-2 in obtaining approval for the contract.  Contractor-2 further stated, in substance and in part, that after the first no-bid contract was awarded to Contractor-2, CC-1 told Contractor-2 that WILLIAMS wanted to be paid for assisting in awarding Contractor-2 the contract.  Contractor-2 told CC-1 that Contractor-2 would not pay WILLIAMS, and CC-1 later called Contractor-2 back and said, in substance and in part, that there had been a communication error and Contractor-2 did not have to pay WILLIAMS.  Although Contractor-2 had discussed three contracts at Farragut Houses with CC-1 and WILLIAMS, Contractor-2 was not awarded the additional two contracts after refusing to pay WILLIAMS.

## **WILLIAMS'S DESTRUCTION OF EVIDENCE AND FALSE STATEMENTS**

  14. Based on my review of public records related to CC-1's federal case, cellphone call detail records and location data, my discussions with other law enforcement agents, my review of notes from federal prosecutors, and my participation in an interview with ANGELA WILLIAMS, the defendant, I have learned the following, in substance and in part, about WILLIAMS's destruction of evidence and false statements to law enforcement once WILLIAMS became aware that her involvement in the bribery scheme with CC-1 was under federal criminal investigation:

   a. On or about October 7, 2022, CC-1 pleaded guilty to receipt of a bribe in violation of 18 U.S.C. § 666(a)(1)(B), and his sentencing was scheduled for January 25, 2023.

   b. On or about the morning of January 11, 2023, several weeks prior to CC-1's sentencing, CC-1's attorney was informed about the text messages between CC-1 and WILLIAMS that showed WILLIAMS's involvement in CC-1's bribery schemes.

   c. Also on or about January 11, 2023, there were multiple calls between WILLIAMS and CC-1 between approximately 12:47 p.m. and 3:05 p.m.

    d. Also on or about January 11, 2023, at approximately 3:40 p.m., WILLIAMS's personal cellphone (the "Cellphone") underwent a "factory reset," which wiped most of the data and text messages prior to that date from the Cellphone.[4]

    e. On or about January 18, 2023, based in part on the evidence of WILLIAMS's involvement in the bribery scheme described above, two cellphones including the Cellphone were seized from WILLIAMS pursuant to a judicially-authorized search warrant.

    f. A search of the Cellphone – the cellphone with which WILLIAMS exchanged the text messages with CC-1 that are described above – revealed the January 11, 2023 factory reset.

    g. On or about January 19, 2023, I and other law enforcement agents interviewed WILLIAMS, who was represented by counsel. During that interview, WILLIAMS, in substance and in part, denied that CC-1 had ever communicated with WILLIAMS about receiving bribes of $1,000 per purchase order. In addition, WILLIAMS denied that, during the week of January 11, 2023, CC-1 had provided WILLIAMS with any information related to his case or the Government's awareness of her possible involvement in criminal conduct.

    h. During the January 19, 2023 interview, WILLIAMS also denied purposefully wiping the Cellphone in order to delete text messages. WILLIAMS said, in substance and in part, that due to a technical issue with the Cellphone, she had had to take it to a particular cellphone store in Manhattan (the "Cellphone Store") and an employee of the store had to reset the Cellphone, which resulted in the loss of her text messages and other data.

    i. Cellphone location data for the Cellphone on January 11, 2023, shows that the Cellphone was in Brooklyn, New York, at the time of the factory reset, and was not in the vicinity of the Cellphone Store in Manhattan to which WILLIAMS claimed to have taken the Cellphone.

    j. The Cellphone Store has no record of a customer visit on January 11, 2023, related to the Cellphone.

---

[4] After the factory reset, WILLIAMS (using the same phone number) began communicating with CC-1 on a different phone number used by CC-1.

WHEREFORE, I respectfully request that a warrant be issued for the arrest of ANGELA WILLIAMS, the defendant, and that she be arrested, and imprisoned or bailed, as the case may be.

/s authorized electronic signature
_____
JEREMY ROSENMAN
Special Agent
U.S. Attorney's Office
Southern District of New York

Sworn to me through the transmission of
this Complaint by reliable electronic
means (telephone), this 25th day of January, 2024.

_____
THE HONORABLE SARAH NETBURN
Chief United States Magistrate Judge
Southern District of New York

9